**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**ALLAN A. PETERSEN,**

        **Plaintiff,**

**v.**                                  **Civil Action  No. 5:06cv106
(Judge Stamp)**

**BRIAN PRICE, MICHELLE SPEARS,
DOMINIC A. GUTIERREZ, SUSAN
MCCLINTOCK, MAVIS HOLYFIELD,**

        **Defendants.**

## OPINION/REPORT AND RECOMMENDATION

### I.  Procedural History

        The *pro se* plaintiff initiated this case on August 31, 2006, by filing a civil rights complaint and a Motion for Preliminary Injunction against the above-named defendants.  The complaint and motion for preliminary injunction seek relief based on the plaintiff's removal from the Bureau of Prisons Kosher diet plan.  On September 18, 2006, the plaintiff filed documents which purport to show the exhaustion of administrative remedies.  On September 20, 2006, the plaintiff was granted permission to proceed as a pauper.  The plaintiff filed exhibits to his complaint on October 23rd, 24th, and November 28, 2006.  The plaintiff paid his initial partial filing fee on November 17, 2006.

        On November 20, 2006, the undersigned conducted a preliminary review of the file and determined that summary dismissal of the complaint was not appropriate at that time.  Moreover, the undersigned directed the defendants to show cause within 10 days why the plaintiff should not be granted an expedited hearing on the claims raised in his motion for injunctive relief.  Summonses were issued that same day and the defendants filed a response to the Court's Show Cause Order on December 4, 2006.

On December 11, 2006, the plaintiff filed a Notice of Reinstatement Procedures to the Certified Processed Kosher Meal Diet Component.

On December 14, 2006, the plaintiff filed objections to the defendants' response to the Court's Show Cause Order. Plaintiff filed exhibits to his objections on January 12, 2007.

On January 22, 2007, the defendants filed a Motion to Dismiss the plaintiff's claim for injunctive relief because such claim had been rendered moot by the plaintiff's reinstatement to the kosher meal program. On January 30, 2007 and February 13, 2007, the plaintiff filed objections to the defendants' motion in which he reargues the claims made in the complaint and asserts that his complaint should not be dismissed. On May 31, 2007, the undersigned granted the defendants' motion and the plaintiff's motion for injunctive relief was dismissed without prejudice as moot.

On February 28, 2007, after being granted an extension of time to file an answer, the defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. A Roseboro Notice was issued on March 5, 2007, and the plaintiff filed a reply on April 25, 2007. Additionally, on May 4, 2007, the plaintiff filed a Declaration and Affidavit in response to the defendants' summary judgment motion. The plaintiff then filed an addendum and a supplement to his reply on May 16, 2007.

Accordingly, this case is before the undersigned for a report and recommendation on the defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.

## II.  The Complaint

In the complaint, the plaintiff asserts that as a federal prisoner, he has a first amendment right to a diet conforming to his religious beliefs. In addition, the plaintiff asserts that pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), prison officials cannot impose

a substantial burden on his free exercise rights unless they can demonstrate that the burdensome regulation serves a compelling state interest and is the least restrictive means available to achieve that interest. Based on the complaint, the undersigned finds that the plaintiff raises the following grounds for relief:

(1) that being served non-kosher meals during institutional lockdowns that took place on March 23, 2006, and April 11, 2006, was a violation of the First Amendment and the RLUIPA;

(2) that the plaintiff was removed from the kosher meal plan in retaliation for his filing administrative grievances about the non-kosher lunch bags;

(3) that plaintiff was discriminated against, and/or treated differently from other inmates removed from the kosher meal plan by requiring him to have a reinstatement interview with the Chaplain;

(4) that the removal of the plaintiff from the kosher meal plan for six months violated his rights under the First Amendment and RLUIPA.

In support of his claims, the plaintiff asserts that he has been incarcerated in the Bureau of Prisons ("BOP") since 1995. The plaintiff asserts that his religious affiliation has been listed as Jewish since April 5, 1996. Moreover, the plaintiff asserts that he has been approved for, and has received, kosher meals at every institution to which he has been designated since his incarceration.

As to his religious beliefs, the plaintiff asserts that under the Jewish faith and law, kosher meals are a central tenet of Judaism. The plaintiff also asserts that he must adhere to specific rules concerning which foods may be eaten and which foods are forbidden. For example, foods that may be eaten include all non-animal products such as fruits and vegetables, meat from animals without cloven hooves and fish which have fins and scales. In addition, the plaintiff asserts that whether a

meal is kosher is also dictated by the manner in which such meals are prepared. Specifically, food is no longer kosher if it has been prepared in containers or trays which have held non-kosher foods and must be served on plates and bowls and eaten with utensils which have not had contact with non-kosher foods. Therefore, the plaintiff asserts that whether meals are kosher is not simply a matter of whether they contain pork or other non-kosher animal products, but also whether they have been properly prepared, stored and presented. The plaintiff asserts that a vegetarian meal is not necessarily kosher.

According to the complaint, the plaintiff arrived at FCI-Morgantown on February 2, 2006, after being transferred from FPC-Seymour Johnson where he had been approved to receive kosher meals. Upon his arrival at FCI-Morgantown, the plaintiff asserts that he immediately requested a continuation of his kosher meals. Plaintiffs' request was approved by the Chaplain, Brian Price ("Chaplain Price"). On March 23, 2006, the institution held a "mock lockdown" of the entire prison. During the mock lockdown, every prisoner, even those on the kosher meal plan, was given a non-kosher bag lunch. The plaintiff asserts that he complained to the Food Services Administrator, Michelle Spears ("Spears"), and to the Associate Warden, Susan McClintock ("McClintock"). The plaintiff asserts that he was told that no kosher lunch bags would be prepared. Accordingly, the plaintiff filed an administrative remedy to the Warden and to Chaplain Price. The plaintiff asserts that he was told by Chaplain Price that the Chaplain would speak to Spears about the issue and that the plaintiff need not take his complaint further.

However, a second violation occurred on April 11, 2006. Therefore, the plaintiff filed a formal complaint with the administration. Shortly thereafter, the plaintiff was cited for a violation of the kosher certified diet program and was removed from the kosher meal plan. The plaintiff was

told that upon a review of his commissary records, it was discovered that on February 14, 2006 and March 7, 2006, he purchased non-kosher food items. Specifically, plaintiff was told that he purchased non-certified cheese. The plaintiff informed Chaplain Price that the commissary did not have kosher cheese available for purchase. Nonetheless, the plaintiff was removed from the kosher meal plan on April 23, 2006, for a period of 30 days, pending reinstatement. The plaintiff asserts that his removal from the kosher meal plan was in retaliation for his filing administrative remedies with regard to the non-kosher lunch bags served during mock lockdowns.

Shortly after his removal from the program, plaintiff filed a request to be reinstated to the kosher meal plan. On May 18, 2006, the plaintiff received written correspondence from Chaplain Price informing him that he was scheduled for a reinstatement interview on May 23, 2006, at 8:30 A.M. On that date, the plaintiff reported for his scheduled interview with Chaplain Price, during which he was asked to complete a questionnaire explaining why he could not eat from the mainline component because of his Jewish faith. The plaintiff asserts that he set forth the "standard of Israelite-Jewish Law," but that he was denied reinstatement back to the kosher diet. Instead, the plaintiff asserts that he was informed by Chaplain Price that his religious dietary needs could be met on the mainline component.[1] The plaintiff asserts that the Chaplain's failure to reinstate him to the kosher diet plan violated his First Amendment right to freely exercise his religion.

The plaintiff immediately complained to McClintock that his rights were being violated and sought her help in having the plaintiff reinstated to the kosher diet plan. The plaintiff asserts that

---

[1] The plaintiff explains that there are two components to the religious diet program, also called the Alternative Diet Program. The first component is a mainline component which allows an inmate to self-select from a food bar which contains a no-flesh option and access to the salad/hot bar. The second component is a nationally recognized, religiously certified processed foods component which meets the kosher requirements of the Jewish faith because it contains foods prepared with kosher utensils, in kosher containers, and separately from the non-kosher foods prepared for the other inmates.

his pleas went unheeded. Specifically, the plaintiff notes that in reply to his request, McClintock found that there was no evidence that the plaintiff's removal from the kosher diet was in retaliation for his utilization of the administrative remedy program or that staff failed to follow proper procedures in removing him from the program. Accordingly, McClintock found that the plaintiff should remain on the mainline component of the alternative diet program. Plaintiff sought further relief through the administrative remedy program, but failed to obtain such relief.

When the plaintiff's attempts at relief in the administrative remedy program failed, the plaintiff asserts that he contacted a Jewish Rabbi for some help in the matter. The Rabbi contacted the BOP on the plaintiff's behalf, but according to the plaintiff, the Rabbi was told by the BOP that the plaintiff is not Jewish.

As a result of his removal from the kosher meal plan, the plaintiff asserts that he began experiencing injuries to his body after being forced to eat nonkosher foods from the mainline component. The plaintiff asserts that the effects were both physical and mental.

Also in the complaint, the plaintiff asserts that the process he had to go through for reinstatement to the kosher meal plan was discriminatory. More specifically, the plaintiff asserts that he was told he would have to be interviewed prior to reinstatement, which he claims was not done. In addition, the plaintiff complains that other inmates who had been removed from the program for handling non-kosher food while on the kosher diet plan, were automatically reinstated to the program after 30 days, meaning, without having to have an interview or evaluation.[2]

---

[2] The plaintiff claims that BOP policy dictates that inmates who wish to participate in the religious diet program have to make a request in writing. Chaplains ordinarily conduct an oral interview and review the request with the chaplaincy team to determine how to accommodate the inmate's stated religious dietary needs. The inmate's responses at the interview will determine which alternative diet program best suits his or her religious dietary needs. An inmate's participation in the program is then entered into the SENTRY computer system so food service can begin serving the approved inmate from

Next, the plaintiff asserts that the First Amendment prohibits jail and prison officials from retaliating against inmates who report complaints, file grievances and file law suits. In this case, the plaintiff asserts that the defendants were clearly aware that the plaintiff had filed administrative complaints at the time they removed him from the kosher meal plan. Thus, the plaintiff asserts that the defendants conspired to remove him permanently from the kosher meal plan in retaliation for the filing of his administrative remedies. The plaintiff asserts that such "senseless retaliation" has left him with irreparable harm and injury to his physical and mental well-being. Plaintiff asserts such conspiracy and retaliation is proven by the fact that other inmates were not required to re-interview after similar 30 day suspensions, but were instead automatically restored to the kosher meal plan after completing their suspension period.

As relief for his alleged injuries, the plaintiff seeks a preliminary injunction against the defendants directing them to immediately return him to the certified religious component of the kosher meal plan at FCI-Morgantown, a jury trial, compensatory damages in the amount of $2.5 million and any other monetary damages the Court deems appropriate.

### III. The Defendant' Motion for Summary Judgment

In this motion, the defendants assert that in July of 1996, the plaintiff was sentenced to a 188-month term of imprisonment by the United States District Court for the District of the Virgin Islands. The defendants assert that the plaintiff's inmate records reveal that he was originally approved for the certified processed food component of the alternative diet program while he was detained at the Metropolitan Detention Center in Guaynobo, Puerto Rico, pending sentence. After

---

the certified processed food line. Those inmates participating in the program are then monitored. If not approved for the certified component, the inmate may resubmit a request at six month intervals. The plaintiff therefore asserts that so long as an inmate is approved for participation in the program, there is no need to re-interviewed.

his sentencing, the plaintiff was designated to FCI-Raybrook in New York. However, SENTRY records show that plaintiff was not approved for the kosher diet at that facility until February 19, 1997. Moreover, the plaintiff was removed from the kosher diet from April 4, 1997 until June 28, 1998. The plaintiff participated in the kosher diet plan until December 2, 1998, when he was again removed from the program. The plaintiff remained on removal status until March 11, 1999, until his transfer to FCI-Ft. Dix on April 4, 2001.

During his stay at FCI-Ft. Dix, the plaintiff remained on the kosher diet plan until his transfer to temporary facilities on April 23, 2002. The plaintiff arrived at FPC-Seymour Johnson in North Carolina on May 28, 2002. He was temporarily released from FPC-Seymour Johnson via a federal writ on October 1, 2003. After his court appearances, the plaintiff returned to FPC-Seymour Johnson on April 28, 2004. The plaintiff remained on the kosher meal plan at FPC-Seymour Johnson until May 21, 2004, and was reinstated to the program on June 16, 2004.

On February 2, 2006, the plaintiff was transferred to FCI-Morgantown. Because the plaintiff had been previously approved for the kosher meal program, upon his arrival, Chaplain Price continued that status without requiring an interview.

The defendants assert that at the time the plaintiff arrived at FCI-Morgantown, Chaplain Price was the only person working in the Chaplaincy Department and that he was responsible for planning, directing, and managing all aspects of the religious activities for the entire inmate population. Chaplain Price also has a number of administrative duties and serves as the subject matter expert on the application of BOP policy to the religious beliefs and practices of the inmate population.

The defendants assert that in March of 2006, the Psychology Services Tech, Jill Henline, was

assigned to provide Chaplain Price with part-time administrative support. As part of her duties, Ms. Henline was charged with insuring that inmates on the kosher meal plan were complying with the rules of participation. In particular, Ms. Henline was responsible for reviewing the commissary purchases of inmates on the plan to insure that they were not purchasing non-kosher food items, a violation of the plan.

On March 15, 2006, Ms. Henline asserts that she pulled the inmate roster to conduct a review of commissary purchases. At that time, she discovered that seven inmates approved for the kosher meal program, including the plaintiff, had made purchases of non-kosher items in the commissary. This information was conveyed to Chaplain Price. However, due to his various other duties, the defendants assert that Chaplain Price was unable to review Ms. Henline's report until April 16, 2002. At that time, the plaintiff and others who were in violation of the program, were removed from the kosher meal program.

According to Chaplain Price, prior to his review of Ms. Henline's report, on March 23rd and April 11th, the institution conducted two "mock lockdowns." These mock lockdowns are simulated emergency training exercises designed to prepare staff for actual emergency situations. During these lockdowns, all inmates are secured in their housing units. Consequently, meals served during the time of the lockdown are bag lunches delivered to the housing units. The simulated lockdowns are conducted on a monthly basis and cover a wide range of emergency situations. These drills, although routine, are not done on the same day of each month and require staff to perform various types of duties depending on the type of simulated emergency presented. The defendants assert that staff is not given advance warning of the exercises and do not know about the exercise until they are pulled from their regularly assigned posts and briefed on the simulated emergency. The defendants

allege that food service staff is likewise unaware of the date on which these exercises will occur and are required to immediately change from preparing dining hall meals, to preparing bag lunches for more than 1200 inmates. The defendants assert that the preparation of these lunches takes three to four hours and they are not prepared in advance. Once normal operations resume, the inmates return to eating their meals in the dining hall. On the dates complained of in the complaint, the inmates were served both their morning and evening meals in the dining hall.

The defendants assert that there is no BOP policy which requires staff to serve inmates certified processed meals during an institutional lockdown. Moreover, the defendants assert that preparing the bag lunches in such a situation results in intense pressure. Therefore, because there had never been any previous complaints, the institution did not serve kosher meals during lockdowns.

However, after the plaintiff complained about the non-kosher lunch bags on March 23, 2006, McClintock met with Spears to discuss the possibility of preparing kosher meal bags. At the time, Spears explained the process and procedure and stressed the demands on Food Service during these times. Spears also informed McClintock that there was no BOP policy requiring kosher meal bags during a lockdown. Therefore, according to the defendants, McClintock personally observed operations in Food Services during the April 11th lockdown and determined that although no policy existed requiring kosher meal bags, it was possible to accommodate these religious diets during a lockdown. Thus, while not inconvenient, McClintock instructed Spears to provide kosher meals in all future lockdowns. According to the defendants, because of the plaintiff's complaints, Food Services has developed new procedures and does in fact provide kosher meals during lockdowns.

On April 16, 2006, the plaintiff was removed from the kosher meal plan for a period of 30

days because he violated the terms of the program by buying non-certified foods from the commissary. Upon plaintiffs' request for reinstatement, Chaplain Price conducted an interview with the plaintiff to determine whether he should be reinstated to the program. Chaplain Price asserts that an interview was necessary because the plaintiff had been transferred with prior approval from another institution and the Chaplain had not had the opportunity to access the plaintiff's religious needs. Moreover, based on his interview with the plaintiff, Chaplain Price concluded that the plaintiff did not demonstrate much knowledge of the Jewish faith and could not explain why he should not be eating non-kosher meals. Chaplain Price found that the plaintiff lacked commitment to the Jewish faith and that his numerous violations of the program mandated his removal from the program. Chaplain Price determined that the plaintiff's religious dietary needs could be met through the self-select component of the alternative diet program and assigned plaintiff to that program. Per policy, the plaintiff was informed he could reapply for the kosher meal plan in six months.

On May 30, 2006, the plaintiff filed an informal remedy with his Unit Manager, Mavis Holyfield ("Holyfield"), in which he challenged his removal from the program. However, according to Holyfield, because she did not have the authority to overrule Chaplain Price's decision, she could not informally resolve the plaintiff's complaint.

On May 24, 2006, the plaintiff filed a formal administrative remedy with the Warden. Because she was the Acting Warden at the time, the plaintiff's formal complaint was addressed by McClintock. In her response, McClintock deferred to Chaplain Price's expertise and denied the plaintiff's request for remedy.

Near the expiration of his suspension from the program, the plaintiff filed a request with Chaplain Price seeking his reinstatement to the kosher meal plan. Chaplain Price granted plaintiff

an interview on December 4, 2006 to discuss the request. At this interview, the Chaplain noted that the plaintiff had made substantial attempts to become more involved in his faith community and that his physical demeanor showed that this issue was very important to the plaintiff and that his request was sincere. Thus, although he still had reservations, Chaplain Price exercised his pastoral discretion and reinstated the plaintiff to the certified meal component, effective December 7, 2006.

With regard to the plaintiff's claims against Dominic Gutierrez, Warden at FCI-Morgantown ("Warden Gutierrez"), and McClintock, the defendants assert that the plaintiff's claims merely allege that those defendants are liable for the constitutional acts allegedly committed by the staff they supervise. However, the defendants argue that they cannot be held liable for the actions of their subordinates under a theory of *respondeat superior* and that they should be dismissed as defendants in this case.

As to Holyfield, the defendants argue that the plaintiff has failed to demonstrate that Holyfield was personally involved in any violation of his constitutional rights. Specifically, the defendants assert that Holyfield was only involved in the alleged violation of the plaintiff's constitutional rights to the extent that, in her official capacity as a unit manager, she received the plaintiff's informal request for resolution. However, because Holyfield did not have the authority to grant the plaintiff the relief he sought, reinstatement to the kosher meal plan, she could not informally resolve his complaint. The defendants assert that Holyfield played no part in the removal of the plaintiff from the program and therefore, should be dismissed as a defendant in this action.

With respect to the plaintiff claims under RLUIPA, the defendants assert that the RLUIPA applies only to state or local authorities and not the federal BOP. Therefore, the defendants assert that the plaintiff has no cause of action under the RLUIPA and that those claims should be

dismissed.

Next, with respect to the plaintiff's First Amendment claims, the defendants assert that the plaintiff has failed to show a violation of his First Amendment rights occurred and that the defendants are entitled to judgment as a matter of law. Specifically, the defendants assert that prison officials have a legitimate interest in making sure that all inmates follow established rules. Moreover, the defendants argue that the BOP has a responsibility to insure that the money spent on costly programs such as the alternative diet program is appropriately spent in light of the BOP's limited resources. In addition, the defendants argue that the plaintiff had alternative means to exercise his religious beliefs and that the impact of accommodating the plaintiff's request following his violation of the program rules would have a substantially adverse effect.

Furthermore, the defendants argue that the failure to provide an inmate with a single religious meal does not rise to the level of a constitutional claim. Moreover, the plaintiff's complaints caused Food Services to revamp its long-standing policy and procedures to accommodate the religious needs of inmates on the alternative diet program, effectively rendering moot, any claims that the plaintiff may have had in that regard.

As to the plaintiff's claims of retaliation, the defendants argue that the plaintiff's claim fails because he cannot provide any evidence that he engaged in protected conduct or that an adverse action was taken against him because of that conduct. In addition, to the extent that the plaintiff relies on the procedures which occurred during the reinstatement of other inmates, the defendants assert that the plaintiff was not in similar circumstances with those inmates. Specifically, the defendants assert that inmate Reisberg, who plaintiff uses as an example, had been interviewed by Chaplain Price prior to his removal from the program. Therefore, Chaplain Price had already had

an opportunity to assess the religious dietary needs of that inmate. On the other hand, the plaintiff had never been interviewed by Chaplain Price and the Chaplain had not had the opportunity to personally assess the plaintiff's needs. Accordingly, the defendants assert that the plaintiff has failed to establish that his constitutional rights were violated and that the defendants are entitled to judgment as a matter of law.

In the alternative, the defendants argue that even if the plaintiff's complaint could be construed to raise constitutional claims, the defendants are entitled to qualified immunity.

## IV. The Plaintiff's Reply

In his objections to the defendant's motion, the plaintiff asserts that the defendants committed perjury in their declarations. Thus, the plaintiff asserts that summary judgment should not be granted and the defendants are not entitled to qualified immunity. Moreover, the plaintiff asserts that the actions of the defendants were malicious and retaliatory and violate his clearly established statutory and constitutional rights.

As to his retaliation claim, the plaintiff asserts that the filing of administrative grievances is constitutionally protected and that he does state a claim of retaliation. Additionally, the plaintiff asserts that a number of courts have held that once a prisoner proves that the protected conduct precipitated the adverse action, then the burden shifts to the defendants to show that the same action would have been taken even in the absence of the protected conduct. As proof that the actions of the defendants were retaliatory, the plaintiff asserts that he was notified of the violation and removed from the kosher meal plan, only five days after he filed administrative remedies about the non-kosher meal bags. The plaintiff also asserts that pursuant to policy, staff was required to notify him about the violation within 24 hours of becoming aware of the violation, but that staff waited more

than a month to notify him of the violation, and not until after he had filed administrative remedies.

As to his free-exercise claims, the plaintiff asserts that his removal from the program was not to further any legitimate penological interest.

As to his claims against Holyfield, the plaintiff asserts that as a unit manager, Holyfield had a duty to hold a hearing regarding plaintiffs' informal administrative remedy. Instead, she merely signed her name to the remedy and stated that the plaintiff's request could not be informally resolved. However, pursuant to 28 C.F.R. § 541.10-11, the plaintiff asserts that Holyfield did have the ability to vacate or discontinue the sanctions imposed upon him by Chaplain Price. The plaintiff asserts that Holyfield did not meet with him or investigate the circumstances surrounding his removal from the kosher meal plan, and therefore, she was personally involved with the deprivation of his constitutional rights.

As to Chaplain Price, the plaintiff asserts that prior to his reinstatement, the Chaplain was required to afford him an oral interview, but instead, only gave him a written interview. In addition, despite completing the questionnaire, Chaplain Price determined that the plaintiff only qualified to eat on the mainline component. Plaintiff states that the Chaplain's decision was contrary to policy and violated his constitutional rights especially in light of the fact that the plaintiff gave identical answers on the questionnaire at both the May interview and the December interview, yet he was denied access to the kosher meal plan in May, but was then approved for the kosher meal plan in December. Moreover, the plaintiff asserts that it is clearly impossible for him to meet his religious dietary needs on the mainline component and that his removal from the program was clearly retaliatory and without justification.

As to the non-kosher bag lunches, the plaintiff asserts that at every federal prison he has ever

been in during his 11 years of incarceration, Food Services has also provided kosher bag lunches during mock lockdowns. The plaintiff asserts that serving kosher bag lunches was the "norm" at federal prisons, except at FCI-Morgantown. Moreover, the plaintiff asserts that according to BOP policy, the only time a federal inmate on the common-fare diet is not to be served a kosher meal is when a specific medical diet is required. Thus, the plaintiff asserts that Spears response to his administrative requests stating that policy did not dictate nor authorize kosher meal bags was untruthful. In fact, the plaintiff asserts that in the response he received from the regional office, he was informed that common fare meals are not to be interrupted during mock lockdowns and that the regional office has discussed the matter with the appropriate departments to insure that such interruption does not happen in the future.

Additionally, the plaintiff asserts that the defendants' declarations are untruthful as to the procedures required to prepare lunch bags during a mock lockdown. The plaintiff asserts that the defendants state that the lunch bags are prepared the day of lockdown and require considerable time and effort. However, the plaintiff asserts that lunch bags are actually prepared days in advance and stored in the Butcher shop until the day of the event. The plaintiff includes affidavits from several inmates whom either currently work in Food Services, or who worked in Food Services on the dates in question, who have attested to the fact that lunch bags are prepared in advance.

Finally, the plaintiff asserts that the defendants have failed to present any evidence that serving kosher bag lunches would present any security problems during lockdown exercises. Thus, the plaintiff asserts that security concerns cannot justify the defendants failure to provide kosher bag lunches. In addition, the plaintiff asserts that because the institution was on lockdown, there was no reasonable alternative to exercise his religious dietary beliefs. The plaintiff asserts that the

inmates are not allowed to leave their housing units, nor is the commissary open.

For these and other reasons, the plaintiff asserts that his complaint should not be dismissed, that summary judgment should not be granted, and that the defendants are not entitled to qualified immunity.

## V.  Standard of Review

### A.  Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations.  Advanced Health-Care Services, Inc., v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990).  Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

### B.  Motion for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. Rule 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the

nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).   The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex</u> at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u> This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u> at  256.  The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment.  <u>Id.</u> at 248.  Summary judgment is proper only "[w]here  the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  <u>Matsushita</u>, at 587 (citation omitted).

## VI.  Analysis

### A.  Defendants Gutierrez and McClintock

In the complaint, the plaintiff, at best, alleges that defendants Gutierrez and McClintock are liable for the alleged constitutional violations committed by the staff that they supervise in their official capacities as Warden and Associate Warden, respectively.  However, a suit against a government agent acting in his official capacity is considered a suit against the United States itself.

Kentucky v. Graham, 473 U.S. 159, 165 (1985). Where damages are sought against federal defendants in their official capacities, the case is deemed as being against the United States. Dugan v. Rank, 372 U.S. 609 (1963). However, "[t]he United States, as a sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941) (citations omitted). The United States has not waived its sovereign immunity from liability for an award of damages arising from alleged violations of the Constitution. FDIC v. Meyer, 510 at 485-86. Accordingly, plaintiffs' Bivens[3] claims against defendants Gutierrez and McClintock in their official capacities are barred by the doctrine of sovereign immunity and those defendants are entitled to summary judgment.

Moreover, liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir.2001)(internal citation omitted). Thus, in order to establish personal liability under Bivens, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976). Instead, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988).

---

[3] Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 395 (1971) (finding that individuals may bring a suit against federal actors for violating rights guaranteed by the United States Constitution or federal law).

Nonetheless, in <u>Miltier v. Beorn</u>, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a <u>Bivens</u> action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." <u>Id.</u> A plaintiff cannot, however, establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. <u>Id.</u> Rather, the plaintiff must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice. <u>Id.</u>

In this case, the plaintiff does not allege any personal involvement on the part of defendants Gutierrez or McClintock in any violation of the plaintiff's constitutional rights. Moreover, the plaintiff has not provided any evidence that these defendants tacitly authorized or were indifferent to an alleged violation of his constitutional rights. In fact, it does not appear that defendant Gutierrez was involved in this matter to any extent. Moreover, defendant McClintock was instrumental in changing the policy and procedures of Food Services so that inmates on the common-fare diet now receive kosher meal bags during lockdown exercises.

Furthermore, to the extent that the plaintiff may be asserting that defendant McClintock violated his constitutional rights by denying his institutional grievances, that claim is also without merit as this is not the type of personal involvement required to state a <u>Bivens</u> claim. <u>See</u> <u>Paige v.</u>

Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003). Accordingly, Plaintiff cannot maintain his claim against defendants Gutierrez and McClintock and those defendants are entitled to judgment as a matter of law

## B.  Defendant Holyfield

With regard to defendant Holyfield, the plaintiff has again failed to establish that this defendant was personally involved in any violation of his constitutional rights. Defendant Holyfield did not remove the plaintiff from the kosher meal plan, nor was she involved in the making or preparing of the non-kosher bag lunches. Holyfield merely responded to plaintiffs' informal request for administrative remedy, which as noted above is not the type of personal involvement to state a Bivens claim. Moreover, even if Holyfield was required to have a hearing, or investigate the plaintiff's complaint more thoroughly, that does not change the fact that Holyfield simply could not grant the plaintiff any informal relief.

Pursuant to BOP policy "[i]nmates wishing to participate in the religious diet program will make the request in writing" and the "Chaplains will ordinarily conduct the oral interview and complete the interview form." See 28 U.S.C. § 548.20(a)(2). Once the interview is complete, "the chaplaincy team will review the request to determine how to accommodate the inmate's stated religious dietary needs." Id. Moreover, only the Warden has the "authority to remove inmates from and reinstate them to the program." § 548.20(b). However, this authority is ordinarily delegated to the chaplains. Id.

Accordingly, as a unit manager, Holyfield did not have the authority to reinstate the plaintiff to the kosher meal plan after he was removed from the plan by Chaplain Price. Thus, his complaint could not have been resolved by Holyfield no matter what process she followed. The plaintiff's only

option was to have the Chaplain's decision reviewed by the Warden and through the appeal process. Thus, Holyfield is entitled to judgment as a matter of law.

## C. **Defendants Price and Spears**

### 1. Claims Under the RLUIPA

Section 2000cc-1 of the RLUIPA provides protection of religious exercise for institutionalized persons. However, the Act defines an institution as "any facility or institution which is owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State . . ." Accordingly, the statutory language clearly shows that the protections afforded to institutionalized persons under the Act applies only apply to prisoners incarcerated in state or local institutions and not in the federal BOP. See Yerushalayim v. United States Dept. of Corr., 374 F.3d 89 (2d Cir. 2004)(RLUIPA only applicable to state or local institutions). Thus, the plaintiff's claims under the RLUIPA must be dismissed.

### 2. First Amendment Claims

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. With regard to prisoners, the Supreme Court has specifically found that a prison inmate retains only those First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Therefore, a prison policy "alleged to infringe constitutional rights [is] judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone v.

Estate Shabazz, 482 U.S. 342, 349 (1987). Furthermore, the Court is required to give deference to the judgment of prison administrators in First Amendment challenges. Id. at 350.

In Turner v. Safley, 482 U.S. 78, 85 (1987), the United States Supreme Court formulated a reasonableness test sensitive to both the need to protect the constitutional rights of inmates and the policy of judicial restraint regarding prisoner complaints. Specifically, the Court determined that when a prison regulation or policy "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. Therefore, although a prison regulation may infringe on an inmate's constitutional rights, that infringement is only actionable to the extent that the regulation is unreasonable. See Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000), cert. denied, 532 U.S. 932, 121 S.Ct. 1382 (2001).

In articulating the Turner test, the Court identified several "factors that are relevant to, and that serve to channel, the reasonableness inquiry." Thornburgh v. Abbott, 490 U.S. 401, 414 (1989). The Turner factors are: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and, (4) whether the regulation represents an "exaggerated response" to prison concerns. Turner at 89-91; Shaw v. Murphy, 534 U.S. 223, 229-30 (2001).

However, prior to considering the Turner requirements, the Court must determine whether there has been an infringement in the first place. See Ali v. Dixon, 912 F.2d 86, 89 (4th Cir. 1990). Thus, the first step is to determine whether the plaintiff is sincere in his asserted religious beliefs,

and if he is, that his claims are rooted in belief and are not "purely secular." Wisconsin v. Yoder, 406 U.S. 205, 215-216 (1972); see also Turner, 482 U.S. at 89-91; O'Lone, 482 U.S. at 345.

Although there is some debate as to whether the plaintiff's religious beliefs are sincerely held,[4] the Court, will assume, for purposes of this Order, that the plaintiff's religious beliefs are sincerely held. That being established, the Court will turn to whether or not the defendants unreasonably restricted his right to practice his religious dietary beliefs.

(a) Plaintiff's Removal from the Kosher Meal Program

Assuming that the plaintiff's religious beliefs are sincerely held, it is not disputed that removing a Jewish inmate from the kosher meal would impinge upon his free exercise of religion or that such removal would substantially burden his religious practice. Instead, the dispute lies in whether there was a rational connection between the BOP's policy of removing an inmate from the kosher meal plan and legitimate penological interests.

Pursuant to 28 C.F.R. § 548.20(a), inmates are given "reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu." Thus, limitations on an inmate's participation in the alternative diet program are expressly related to two

---

[4] The defendants argue that "He who seeks justice must do justice." Memorandum (dckt. 52-2) at 22. In support of this claim, the defendants assert that, of his own accord, the plaintiff purchased non-certified foods from the commissary. Moreover, the defendants assert that it is significant that the plaintiff has been removed from the kosher meal plan at several different institutions. The defendants assert that plaintiff's numerous violations of the program call into question his commitment to his faith and the sincerity of his beliefs. Additionally, the defendants point out that the sincerity of the plaintiff's beliefs were even questioned by Rabbi Spitzer, who initially became involved in this case to help the plaintiff. For these reasons, the defendants believe that the plaintiff exercises his religious beliefs only when doing so is convenient for him. However, the defendants also recognize that for purposes of summary judgment, the Court must accept all well-pleaded facts as true. In this case, despite the inconsistencies in the plaintiff's religious practices, the Court will accept that the plaintiff's religious beliefs are sincerely held, even though the Court acknowledges that there is evidence to the contrary.

penological interests: (1) constraints of budget limitations; and (2) the security and orderly running of the institution and the Bureau.

Prison officials clearly have an obligation to insure that religious programs are run efficiently and within the appropriated budget. Therefore, as has recently been recognized in this Circuit, prison officials have a legitimate interest in providing special meals "only to those inmates who demonstrate a sincere religious belief requiring such a practice." See Raiford v. Wallens Ridge State Prison, 2006 WL 2350162 *2 (W.D.VA. Aug. 11, 2006). Therefore, requiring inmates to show that their religious beliefs are sincerely held prior to approval into the program is not a constitutional violation. Id. To the extent then, that the plaintiff complains that he was required to undergo an examination of his religious beliefs, such a claim has no merit. There is simply no other way for the Warden or Chaplain to determine the sincerity of the plaintiff's religious beliefs. Thus, it was reasonable for Chaplain Price to conduct an interview with the plaintiff about his religious beliefs and such interview is rationally related to a legitimate penological interest.

In addition, to the extent that the plaintiff argues that Chaplain Price's determination regarding the plaintiff's religious dietary needs was incorrect, the Court is mindful that in reviewing the decisions of prison officials, such decisions are to be accorded some deference. See United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). Here, Chaplain Price was the institution's expert with regard to religious matters and the application of policy to the religious rights of inmates. Taking into consideration the plaintiff's repeated violations of the alternative diet program, the plaintiff's failure to expressly articulate the reasons for needing kosher meals,[5] and the plaintiff's alleged lack of participation with the Jewish community, Chaplain Price made a reasonable

_____

[5] Simply quoting scripture without further explanation is not sufficient.

determination that the plaintiff's religious dietary needs could be meet through the self-select component of the program.

As to the security and orderly running of the institution, the Court agrees that "in the interests of managing the prison," prison officials have a legitimate interest in insuring that all inmates follow established rules and regulations. Memorandum at 24. In this case, the petitioner clearly violated the terms of the alternative diet program by buying non-kosher foods from the commissary. See Program Statement 5360.09 ("PS 5360.09), page 19, ¶ 18(b) (inmates observed eating from the mainline or who purchase and/or consume non-certified foods from the commissary may be removed from the program).[6] The stated purpose of removing an inmate from the program in light of a violation is "in order to preserve the integrity and orderly operation of the religious diet program and to prevent fraud." Id. Clearly, these goals further a legitimate interest. See Hodges v. Virginia, 871 F.Supp. 873, 876 (W.D.VA. 1994), *rev'd on other grounds*, ("security, discipline, order, public safety, and rehabilitation, need no defense"); see also Thornburgh v. Abbott, 490 U.S. at 404-07 (prison officials are given considerable deference in determining what regulations are reasonable necessary to maintain order and safety in the institution).[7]

_____

[6] Curiously, in his objection and reply to the defendants' motion for summary judgment, the plaintiff, for the first time, asserts that he purchased the non-certified foods for another inmate. However, it is a violation of the program to merely purchase non-kosher foods, plaintiff need not actually consume them. Thus, the plaintiff's claim that he purchased the non-certified foods for another inmate does not save his complaint from summary judgment.

[7] Additionally, removal is not punitive in nature. PS 5360.09, page 19 at ¶ 18(b). Thus, the Court is not persuaded by the plaintiff's argument that he could not be sanctioned for violating the program because he was not notified of the charges within 24 hours of the time in which his violations were discovered. The regulation that the plaintiff cites in support of this argument, 28 C.F.R. § 541.11, is a regulation which governing the imposition of sanctions in a prison disciplinary proceeding where concerns of due process are present. There are simply no such concerns in this case. There is simply nothing in 28 C.F.R. § 548.20, or in the corresponding program statement which requires that an inmate cannot be removed from the program if he is not informed of a violation within 24 hours. In fact, PS 5360.09 requires only that an inmate be given written notice that he has violated the program and that he

As to the second prong of the <u>Turner</u> factors, the plaintiff was not denied alternative means of exercising his religious beliefs. With regard to the plaintiff's religious dietary needs, the plaintiff was approved for the self-select component of the alternative diet program. The self-select line, although not certified, allowed the plaintiff to avoid foods found not be in compliance with his religious preferences.

As to the third prong of the <u>Turner</u> factors, the defendants argue that accommodating the plaintiff following his numerous violations of the program's rules "would have completely undermined the integrity of the religious diet program." Memorandum at 24-25. Specifically, the defendants note that the failure of having consequences for violations of the program would teach inmates that they do not have to follow rules and regulations they deem inconvenient. The defendants argue that such a mindset would be dangerous to staff and other inmates. The undersigned agrees. There simply is no alternative but to remove an inmate from the program if he violates the terms of the program. To do otherwise would undermine prison authority and regulations. Without discipline and consequences, there could be no security or orderly running of the institution.

In addition, the defendants argue that institutions run on a limited budget and that the religious diet program is expensive. Therefore, the defendants argue that although staff has an obligation to insure that an inmate's religious rights are not violated, staff also has a fiduciary duty to the public to insure that funds are appropriately spent. Thus, allowing inmates to remain on the kosher meal plan without determining whether their religious beliefs are sincerely held, or after

---

may be removed from the program. <u>See</u> PS 5360.09, page 19 at ¶ 18(b). Plaintiff does not argue that he received no notice, only that he did not receive notice within 24 hours of Chaplain Price becoming aware of the violations.

having violated the terms of the program, would have a tremendous impact on staff and the allocation of prison resources. Once, again, the undersigned has to agree. Because the program is expensive and the Bureau has limited resources, it is imperative that inmates on the certified meal program hold sincerely held religious beliefs which would require their participation in the program and that inmates who fail to comply with the terms of the program be removed. Nonetheless, it is important to point out that inmates are not necessarily removed from the program permanently. As happened here, the inmate may reapply and be approved at a later date.

Finally, as the fourth <u>Turner</u> factor, the undersigned does not believe that the plaintiff's removal from the kosher meal program was an exaggerated response. As previously noted, the defendants simply had no alternative but to remove the plaintiff from the program for his violation. Moreover, as per policy, prior to the plaintiff's reinstatement to the program, Chaplain Price was well within his authority to conduct an interview of the plaintiff to determine if the plaintiff's religious dietary needs could be met in other ways. Plaintiff had violated the policy on numerous occasions, and although approved for the program upon his arrival, had not been evaluated by Chaplain Price. Simply because the plaintiff was approved elsewhere does not necessarily mean he must be approved at every subsequent institution. Each institution has its own special needs and the plaintiff's circumstances had clearly changed. The violations in question took place at FCI-Morgantown and that institution was responsible for bearing the costs of plaintiffs' participation in the program. Thus, those officials had the right to determine whether the plaintiff should remain on the program. Moreover, the undersigned finds that it is inappropriate in this instance to second guess the expertise of Chaplain Price.

Accordingly, even if the plaintiff's removal from the kosher diet program impinged upon his

constitutional rights, his removal was reasonably related to legitimate penological interests. Thus, the plaintiff has failed to establish that his First Amendment rights were violated and the defendants are entitled to judgment as a matter of law.

(b) <u>Serving Non-Kosher Lunch Bags During Lockdowns</u>

With respect to the plaintiff claims that his First Amendment rights were violated on March 23, 2006 and April 11, 2006, when he received non-kosher lunch bags, the undersigned finds this claim to be without merit. On the dates in question, the plaintiff received his morning and evening meals and the failure to provide an inmate with a single religious meal does not rise to the level of a constitutional claim.[8] <u>See</u> <u>Thomas v. Condit</u>, 2006 WL 1642226 (W.D.N.C. June 13, 2006). If the plaintiff was not satisfied with the contents of his lunch bag, he was not required to eat it. Accordingly, the plaintiff has failed to establish that his First Amendment rights were violated and the defendants are entitled to judgment as a matter of law.

3. <u>Retaliation Claims</u>

In order to sustain a claim based on retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir.1994). Therefore, "in forma pauperis plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B) ]." <u>Id.</u> Furthermore, claims of retaliation are treated with skepticism in the prison context. <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir.1996). Additionally, a plaintiff alleging that government

---

[8] With regard to this issue, because the undersigned finds that the plaintiff fails to state a claim on the face of his pleadings, the undersigned has not addressed the dispute of fact with respect to whether the lunch bags were prepared in advance as this dispute is not material to the merits of the claim.

officials retaliated against her in violation of her constitutional rights must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights. "American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993).

In support of this claim, the plaintiff asserts that the defendants removed him from the kosher meal plan in retaliation for filing administrative grievances about the non-kosher lunch bags served during a lockdown. However, the Fourth Circuit has held that inmates do not have a constitutional right to participate in grievance procedures.[9] Adams, 40 F. 3d at 75. Accordingly, the plaintiff cannot state a claim for retaliation and the defendants are entitled to judgment as a matter of law.

### 4. Discrimination/Equal Protection Claims

To be successful on an equal protection claim, the plaintiff must demonstrate "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F. 3d 648, 654 (4th Cir. 2001). If the plaintiff makes such showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

In this case, the plaintiff asserts that he was treated differently than other inmates similarly situated. However, the defendants assert that the plaintiff's claim is without merit as the example he provides in support of his claim is of an inmate who was not similarly situated. Specifically, the defendants assert that inmate Reisberg had been previously afforded an interview with Chaplain Price in which the Chaplain was able to personally assess inmate Reisberg's religious dietary needs. However, because the plaintiff came to FCI-Morgantown with prior approval for the kosher meal

---

[9] The cases cited by the plaintiff in his objection, in which it has been found that filing grievances is a constitutionally protected activity, are from the Seventh and Third Circuits. See Objections (dckt. 70) at 3 (citing Dewalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000); Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). However, as noted above, the Fourth Circuit has specifically found otherwise.

plan, Chaplain Price automatically granted the plaintiff approval into the program upon his arrival. The Chaplain had never had the opportunity to personally assess the plaintiff's religious dietary needs until plaintiff filed for reinstatement after his suspension from the program. Therefore, the Chaplain conducted an interview of the plaintiff upon his application for reinstatement so he could make a personal assessment of the plaintiff's religious dietary needs. The same process was not necessary for inmate Reisberg because that inmate had already been personally assessed by the Chaplain. Accordingly, the defendants assert that the plaintiff cannot show that he was discriminated against or that he was treated differently than other inmates who were similarly situated.

Upon a review of the facts, it is noted that the plaintiff does not dispute the assertion in Chaplain Price's affidavit that he and inmate Reisberg were not similarly situated. Accordingly, the plaintiff has failed to establish that requiring him to interview with Chaplain Price prior to reinstatement into the kosher meal plan was either discriminatory or violated his equal protection rights. Thus, the defendants are entitled to summary judgment as to this claim.

**VII. Recommendation**

For the reasons set forth in this Order, the undersigned recommends that the defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (dckt. 54) be GRANTED and the plaintiff's complaint be DENIED and DISMISSED with prejudice.

Within ten (10) days after being served with a copy of this Opinion/Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable Frederick P. Stamp, Jr., United

States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Opinion/Report and Recommendation to the *pro se* plaintiff.

DATED: June 1, 2007.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE